# United States Court of Appeals
## For the First Circuit

No. 10-1126

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL POULIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

David J. Van Dyke, with whom Hornblower Lynch Rabasco & Van
Dyke, P.A. was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Thomas E.
Delahanty II, United States Attorney, was on brief, for appellee.

January 7, 2011

**STAHL, <u>Circuit Judge</u>**. Defendant-appellant Daniel Poulin was convicted after a bench trial for the production of child pornography in violation of 18 U.S.C. § 2251(a). Poulin challenges his conviction on two grounds. First, he asserts that § 2251(a) is unconstitutional as applied to him because his conduct was purely personal and did not have a substantial effect on interstate commerce. Second, he argues that the evidence against him was insufficient to sustain a conviction because the government failed to show that he "produced" sexually explicit images of a minor using materials that traveled interstate. We find Poulin's claims unavailing and affirm.

## I. Background

This appeal follows a conviction, and thus we recount the facts in the light most favorable to the verdict. <u>United States</u> v. <u>Mercado</u>, 412 F.3d 243, 245 (1st Cir. 2005).

Poulin, a public adjuster, began dating W.R.[1] in 1999 after meeting her through a mutual friend. A few months after they began dating, Poulin moved in with W.R. and six of her children to W.R.'s house near Howland, Maine. N.R., one of W.R.'s daughters, was thirteen-years-old at the time. After moving into the house, Poulin built a private office in the basement where he spent several hours a day.

---

[1]For privacy purposes, references to Poulin's then-girlfriend and the two victims involved will be by initial only.

Within a brief period of time after Poulin moved in with the family, he began to buy various forms of covert camera equipment from Terry Dicus, the owner of Spy Shop 2000 located in Houston, Texas. The equipment included clock radios, each installed with a pinhole camera and a wireless transmitter; receivers; unadorned pinhole cameras and their associated components; cables; power supplies; wireless transmitter systems; and various recording and monitoring devices. Dicus bought his inventory from a Louisiana supplier, and he shipped Poulin's purchases from Texas to Maine.

Over the course of N.R.'s adolescence and without her knowledge or consent, Poulin surreptitiously videotaped sexually explicit images of N.R.[2] The filming took place in the bathrooms of the various residences in which Poulin and the family lived. These residences included the Howland, Maine house; an apartment in Augusta, Maine where Poulin and N.R. stayed occasionally; a primitive cabin in Islesford, Maine located next door to the home of Poulin's mother and where the family spent its summers; and a

---

[2]Although Poulin challenged at the district court the sexually explicit nature of the footage, he did not raise the issue in his appellate briefs. Further, although he asserted at oral argument that not all of the images were sexually explicit, he admitted that some were, and he offered no argument that the finding below that there were sexually explicit images was in error. The issue is waived. See United States v. Pulido, 566 F.3d 52, 60 n.4 (1st Cir. 2009) ("'[E]xcept in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.'") (quoting United States v. Giggey, 551 F.3d 27, 36-37 (1st Cir. 2008)).

house in Trenton, Maine where the family took up residence after the Howland home burnt down. As for the Islesford cabin, at some point after Poulin acquired it, he made significant renovations to it and installed all of the wiring and plumbing himself. The water heater for the cabin was kept in a locked bedroom closet off a bedroom in which Poulin would spend approximately five hours a day.

On October 26, 2006, W.R. found four DVDs on the ground outside of the Islesford cabin. She played the disks and discovered that they contained nude images of N.R. W.R. confronted Poulin about the DVDs and Poulin apologized.

The next day, Poulin gave authorities permission to search the Islesford cabin and seize evidence. The police discovered four hidden cameras in the bathroom, equipment which Dicus identified as being consistent with the pieces that he sold to Poulin. Wiring from the hidden cameras led to the locked bedroom closet. A clock radio containing a power adapter for a camera was discovered in a building behind the cabin, and it too resembled the clock radios from Dicus and those that Poulin kept in the bathrooms of the Howland and Trenton homes. Poulin also turned over a briefcase and black plastic box stowed next door in his mother's attic. The briefcase and box contained additional DVDs, a minicassette camcorder and power cables, thirty-two minicassette tapes, additional pinhole cameras, transmitters, a DVD recorder, a

VHS recorder, additional cables, a computer hard drive, a video maker magazine, and empty condom wrappers.

Labels on the equipment and testimony at trial indicated that the equipment was made internationally. The media equipment was manufactured by Sony, Fujifilm, Maxwell, Panasonic, and Verbatim. Witnesses who worked for the companies testified that none of their products were produced in Maine and that, generally speaking, their products were manufactured in Asia.

In total, authorities retrieved approximately forty-eight DVDs. The seized footage took several hundred hours to view, and ninety-five percent of the images were depictions of N.R. at different camera angles in various stages of undress. In addition, two clips showed nude footage of N.R.'s then sixteen-year-old friend, G.J., apparently recorded when G.J. stayed with the family for a two-week period. All of the images, which were streamed video, were spliced together into a playable video clip, and some of the most explicit pictures were repeated several times and edited to be viewed in slow motion.

At trial, the government showcased a sample of the footage. Although there was not an image from each item of media seized, the investigator testified that he and his team used certain indicators, such as N.R.'s naval piercing and shoulder tattoo, to date the images and ensure that the sample depicted N.R. while she was still a minor. Indeed, several of Poulin's friends

testified that after the authorities discovered Poulin's stash, Poulin confessed to them that he had been taping N.R. for several years, that he was "sick," and that he needed help.

On September 8, 2009, Poulin's bench trial began. At the close of the government's case in chief, Poulin moved for judgment of acquittal on two grounds. He argued that § 2251(a) was unconstitutional as applied to him because his conduct did not implicate interstate commerce since the images of N.R. were solely to satisfy Poulin's personal fetish, and they were not intended to be, nor ever actually, distributed. He also claimed that the evidence was insufficient to convict him because the government failed to show that he "produced" sexually explicit images of a minor using materials that traveled interstate. On September 14, 2009, the trial court denied the motion and convicted Poulin. Poulin timely appealed.

## II. Analysis

A. Constitutional Claim

We review de novo constitutional challenges to a federal statute. <u>United States</u> v. <u>Rene E.</u>, 583 F.3d 8, 11 (1st Cir. 2009).

Section 2251(a) reads in pertinent part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished as provided under subsection (e) . . . if that visual depiction was produced or transmitted using materials that

> have been mailed, shipped, or transported in
> or affecting interstate or foreign commerce by
> any means . . . .

18 U.S.C. § 2251(a).

Poulin argues that § 2251(a) is unconstitutional as applied to him because his conduct did not have a substantial effect on interstate commerce and therefore is outside the class of activities that Congress may properly regulate. He asserts, rather, that his conduct was entirely personal and private and based on a voyeuristic obsession with N.R. The images were never viewed nor intended to be viewed by anyone other than Poulin, nor were they disseminated, distributed, or put to any commercial purpose.

Poulin's claim fails. In United States v. Morales-De Jesús, 372 F.3d 6 (1st Cir. 2004), this court rejected both a facial and as-applied challenge to § 2251(a) premised on the argument that the statute exceeded congressional authority under the Commerce Clause because it attempted to regulate intrastate child pornography created exclusively for personal use. We first held that § 2251(a) was valid on its face in regulating intrastate child pornography production because such activity, when taken in the aggregate, had a substantial effect on interstate commerce. Id. at 14-17 (relying on Wickard v. Filburn, 317 U.S. 111 (1942)); see United States v. Robinson, 137 F.3d 652, 656 (1st Cir. 1998).

As to the as-applied challenge, we considered whether the videotaping of two sexual encounters between the defendant and a thirteen-year-old girl fell outside the class of activities properly regulated by Congress because the defendant produced the images solely for his own gratification and did not purchase, trade, or sell the self-generated pornography, or have any intention to do so. We found the conduct within Congress' reach because:

> [w]hen Congress regulates a class of activities that substantially affects interstate commerce, a defendant's claim that his personal activities did not affect interstate commerce fails if his activity is within that class. When "a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence."

Id. at 17 (quoting United States v. Lopez, 514 U.S. 549, 558 (1995)) (internal quotation marks omitted).

Morales controls the outcome here. Poulin's conduct, the videotaping of sexually explicit images of N.R. and G.J. as minors, is part of a class of activities, the production of child pornography, that has a substantial effect on interstate commerce. The purely personal nature of his conduct is irrelevant for purposes of § 2251(a)'s constitutionality.

Poulin futilely attempts to define his conduct at a level of specificity designed to render it non-economic, characterizing the images as "nonfungible" due to his singular obsession with N.R.

The proper query on an as-applied Commerce Clause challenge, however, relates only to whether the class of activities regulated is a class within the reach of federal power, and we "refuse to accord decretory significance" to whether the commodity at issue is fungible. United States v. Nascimento, 491 F.3d 25, 42 (1st Cir. 2007) (rejecting as-applied challenge to RICO statute even though the criminal activity at issue was neither economic nor fungible). When Congress addresses "a problem that is legitimately within its purview, . . . the court should respect the level of generality at which Congress chose to act." Id. (citing Gonzales v. Raich, 545 U.S. 1, 22 (2005)).[3]

To be sure, Morales left open the possibility for future as-applied Commerce Clause challenges to § 2251(a), particularly if the circumstances involved did not implicate child exploitation. Relevant factors may include "the age of the minor, the relationship between the defendant and the minor, the nature of the allegedly sexually explicit conduct, and the nature of the visual depiction of that conduct." 372 F.3d at 18. None of these factors are relevant for present purposes. Indeed, Poulin does not even attempt to apply them. Accordingly, because Poulin's conduct falls within the sphere of activity that Congress legitimately regulates, we reject his claim.

---

[3]We note also that the footage retrieved is not fully consistent with Poulin's theory of a singular obsession since it also depicted naked images of N.R.'s friend, G.J.

B. Sufficiency of the Evidence Claim

We review de novo Poulin's challenge to the sufficiency of the evidence underlying his conviction to determine "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005) (quoting United States v. Richard, 234 F.3d 763, 767 (1st Cir. 2000)). We consider both direct and circumstantial evidence. United States v. Stierhoff, 549 F.3d 19, 26 (1st Cir. 2008). The court's only inquiry is whether the guilty verdict "is supported by a plausible rendition of the record." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

Poulin argues that the government failed to prove that he "produced" sexually explicit images of a minor using materials that traveled in interstate commerce. His argument is two-fold. First, he claims that the government "failed to present any evidence establishing at what point in the camera -- recording device -- disk continuum 'production' of any . . . images occurred." His argument appears to be that "production" occurs only in a recording device, but the recording devices seized were recovered from his mother's attic, not from the cabin where the cameras and DVDs were found. Second, he argues that the evidence was insufficient

-10-

because no particular image was connected to a particular recording device that traveled in interstate commerce.

As to Poulin's claim that the government's evidence was insufficient to prove that Poulin "produced" the images, we find it without merit. To sustain a conviction under § 2251(a), the government must prove that Poulin produced a visual depiction of a minor engaged in sexually explicit conduct using materials that had been mailed, shipped, or transported in interstate or foreign commerce. 18 U.S.C. § 2251(a). Congress defined the term "producing" as used in § 2251(a) to mean "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. § 2256(3).

We find that Congress did not intend so technical a definition of the term "produced" as Poulin would have it. Such a holding comports with Congress' list of assorted terms defining "producing," along with our own precedent and that of many of our sister courts. See, e.g., id.; United States v. Ortiz-Graulau, 526 F.3d 16, 19 (1st Cir. 2008) (interpreting § 2251(a) to require only that a visual depiction be made); United States v. Fadl, 498 F.3d 862, 867-68 (8th Cir. 2007) (finding Congress intended a nontechnical definition of "producing" and sought to include activities not generally considered to fall within the typical meaning of the term); United States v. Smith, 459 F.3d 1276, 1297-98 (11th Cir. 2006) (finding "producing" not unduly technical or

-11-

ambiguous); United States v. Angle, 234 F.3d 326, 341 (7th Cir. 2000) (rejecting restrictive definition and holding that images copied onto computer diskettes are "produced"); Robinson, 137 F.3d at 653-54 (noting evidence of photographs taken with camera and film manufactured outside of state was offered to show "production" using materials shipped in interstate commerce); United States v. Lacy, 119 F.3d 742, 750 (9th Cir. 1997) (finding images copied onto computer were created and therefore "produced"). But see United States v. Wilson, 182 F.3d 737, 741-43 (10th Cir. 1999) (finding images recorded onto diskettes that traveled interstate insufficient to satisfy "production" requirement).

Congress intended a broad ban on the production of child pornography and aimed to prohibit the varied means by which an individual might actively create it. See 18 U.S.C. § 2256(3); Fadl, 498 F.3d at 868. As such, the government did not need to establish at what point "production" occurred, nor produce in evidence a recording device recovered from the Islesford cabin. A reasonable factfinder could have found that the substantial evidence introduced at trial -- pinhole cameras recovered from the cabin bathroom; wiring from the cameras that led to the bedroom closet; cables, transmitters, and recording devices that Poulin secreted in his mother's attic; and DVDs evincing sexually explicit images of a minor -- proved that Poulin "produced" the images.

-12-

Finally, Poulin admitted to taping N.R. over the course of several years. Indeed, several witnesses testified at trial that Poulin confessed to them that he had been "taking pictures of," "making movies of," and "videotaping" N.R. while she was a minor. A reasonable factfinder could have credited this testimony as proving production.

With respect to Poulin's argument that no particular image was connected to a particular recording device that traveled in interstate commerce, it too fails. All of the media equipment and materials seized were manufactured outside of Maine. It was reasonable for a factfinder to conclude that Poulin used these materials to produce the sexually explicit images.

## III. Conclusion

For the foregoing reasons, we affirm the conviction. So ordered.