# United States Court of Appeals
## For the First Circuit

Nos. 11-1013
    11-1038
    11-1322
    11-1478

UNITED STATES,

Appellee,

v.

JERRY OMAR RODRÍGUEZ-REYES, a/k/a Quiri;
MELVIN MÉNDEZ-ROLDÁN, a/k/a Mel;
HÉCTOR MANUEL GONZÁLEZ-SUÁREZ, a/k/a Palomo; and
JOSÉ L. CABRERA-COSME, a/k/a Luis Villalobos,
a/k/a Luis Canales,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen C. Cerezo, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Alan D. Campbell for Jerry Omar Rodríguez-Reyes.
Johnny Rivera González for Melvin Méndez-Roldán.
Lydia Lizarribar-Masini for Héctor Manuel González-Suárez.
Elfrick Méndez Morales for José L. Cabrera-Cosme.
Julia M. Meconiates, Assistant United States Attorney, with
whom Nelson Pérez-Sosa, Assistant United States Attorney, and Rosa
Emilia Rodriguez-Velez, United States Attorney, were on brief, for
the United States.

April 11, 2013

**LYNCH, Chief Judge**.  In this consolidated appeal, four defendants challenge their jury convictions and sentences for drug and firearm crimes.  A federal jury in Puerto Rico convicted each defendant on one count of conspiracy to possess with intent to distribute narcotics and one count of conspiracy to use or carry firearms in furtherance of a drug trafficking crime.  The district court, after considering all of the evidence, including evidence of seven murders committed in furtherance of the narcotics conspiracy, sentenced each defendant to life in prison on the first count and ten years' imprisonment on the second count, to be served consecutively.

Finding that the evidence was sufficient to support the guilty verdicts as to each defendant; that the district court did not err in imposing the life sentences as to defendants Méndez-Roldán, González-Suárez, and Rodríguez-Reyes; and that the court did not err in denying severance as to defendant Cabrera-Cosme, we affirm.

I.

Because this appeal follows the defendants' convictions, we recite the trial evidence in the light most favorable to the jury's verdicts.  See United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011).

The cocaine and marijuana distribution conspiracy and related use of firearms in this case took place in and around two

-3-

public housing projects in San Juan, Puerto Rico -- Nemesio R. Canales and Lloréns Torres -- during the years 2003 through 2006. In the Canales project, there was a straightaway spanning some of the buildings, which was known as La Recta; this was where most of the drugs at issue were sold. The government offered four co-conspirator witnesses, surveillance videos, and seized evidence such as drugs (including crack vials and bags of marijuana), firearms, and bullets to prove the extent of the drug conspiracy at La Recta.

"Mel" -- defendant Melvin Méndez-Roldán ("Méndez") -- personally controlled all crack cocaine sales at La Recta during 2003. He did not sell the crack himself, but instead employed a runner, Delia Sánchez-Sánchez ("Sánchez"), who testified for the prosecution at trial. Sánchez said that she, with the help of others, sold one-eighth of a kilogram of crack per week on Méndez's behalf. Sánchez received packages from Méndez that each contained 25 vials of crack, and she distributed the packages among various sellers, who made the sales directly to the purchasers. Méndez's profit from each package was $4000.

In addition to these crack sales, Méndez charged a monthly rent to other drug "owners" who wanted to sell marijuana at La Recta. Until his arrest in 2003, Méndez did not allow anyone else to sell crack there.

Méndez himself regularly patrolled La Recta with firearms, and he frequently used violence, including lethal violence, to maintain control of the drug point. He shot and beat up various drug addicts at La Recta when they lingered there (because he feared they would attract the police), and he shot at a group of rival crack dealers who had opened a new drug point nearby. In January 2003, Méndez and three others ambushed and killed Alexis Rivera Feliciano ("Rivera"), whom they believed to be a federal informant. When the police arrived at the scene where Rivera's body lay, Méndez reappeared and began laughing.

There was more. Méndez told Sánchez that he suspected that the wife of Luis Ortiz Santos ("Ortiz"), a/k/a "Cleca," an addict at the Canales project, was also an informant. In May 2003, Sánchez saw Méndez follow Ortiz behind a building; she heard a gunshot, then saw Méndez and two others put what appeared to be a body wrapped in a shower curtain into the trunk of a car. The police found Ortiz's body three days later, covered in a shower curtain. Méndez bragged about his role in both of these murders to one of the marijuana distributors at La Recta, Rey Manuel Rodríguez-Esperón, a/k/a "Reyito."[1]

Méndez was arrested in 2003, but he continued to exert control over the crack sales at La Recta from his prison cell. For

---

[1] Rodríguez-Esperón was indicted along with the four defendants in this appeal, but his trial was severed and he later testified at trial in this case against his former codefendants.

-5-

example, during the summer of 2005, Méndez ordered Reyito to shut down a crack point Reyito had opened, through a message delivered by Méndez's brother-in-law, defendant José Cabrera-Cosme ("Cabrera"), a/k/a "Luis Villalobos." After Méndez's arrest, Cabrera took over direct control of crack sales at La Recta. Sánchez testified that Cabrera supplied her with crack just as Méndez had, and that Cabrera continued to collect rents from the marijuana owners on Méndez's behalf. Cabrera also sold his own crack at La Recta, sometimes using the same sellers who sold Méndez's crack.

Defendant Héctor González-Suárez ("González"), a/k/a "Palomo," was allowed by Cabrera to begin selling crack at La Recta in February 2004. González was a friend of Méndez's. Although González was from Lloréns Torres, he came to sell at La Recta because he was in a "war" with another drug point at Lloréns Torres. González paid a monthly rent to Méndez and used the same prices, runners, and sellers as Méndez did. He carried a gun while he sold drugs at La Recta.

Defendant Jerry Rodríguez-Reyes ("Rodríguez"), a/k/a "Quiri," began selling marijuana at La Recta in 2004. Like González, Rodríguez was from Lloréns Torres but stopped selling there because of the war. At La Recta, he used Sánchez as a seller and occasionally paid her husband to package his marijuana.

Rodríguez sold approximately one pound of marijuana every two to three days, and he also carried a gun.

After Méndez's arrest, the other three defendants continued using violence to protect, and try to expand, the drug business. For instance, González and Cabrera formed a plan to try to take over the drug point at Calle 4 in Lloréns Torres, where González's rivals were based. On the night of July 12, 2004, González, Rodríguez, and three others drove a stolen SUV to Calle 4 and opened fire on the dealers there. Three people died in the shooting. At the scene, the police recovered an AK-47 and shell casings from other long guns, such as M-16s or AR-15s. González later boasted about his participation in the shootout.

In 2005, Reyito told Cabrera and González that someone known as Indio had started selling crack nearby without permission, and Cabrera and González agreed that they should kill Indio. González recruited Reyito and two others to help him locate Indio, telling them not to shoot Indio until González gave the signal. The group could not find Indio at that time, but three days later Reyito saw him near La Recta, and González shot him. Sánchez testified that she witnessed the murder from the balcony of her apartment, and González later told Reyito that he had killed Indio.

Also in 2005, a marijuana owner known as Agustín began acting erratically, including brandishing guns around La Recta; later that year, he killed another marijuana dealer. Cabrera,

-7-

González, Rodríguez, Reyito, and two others discussed Agustín's behavior and decided to kill him.  González provided Rodríguez with a pistol, but since Rodríguez already had his own gun, he gave the pistol to Reyito.  Cabrera also gave his pistol to one of the members of the group.  González, Rodríguez, and Reyito then located Agustín near one of the buildings in the housing project, and while González greeted Agustín with an embrace, Rodríguez shot Agustín in the back of the head.  When Agustín fell to the ground, González and Rodríguez continued to shoot him.  Agustín died of the gunshot wounds.

González was indicted on September 15, 2006, on federal drug and firearm charges.  Méndez, Cabrera, and Rodríguez, along with González and 22 others, were indicted five days later on federal drug and firearm conspiracies.

## II.

The second superseding indictment, under which all four defendants were ultimately tried, charged each defendant with one count of conspiracy to distribute, and possess with intent to distribute, both marijuana and over 50 grams of crack cocaine within 1000 feet of a public housing facility and public school, in violation of 21 U.S.C. §§ 841 and 860; and one count of conspiracy to possess, use, carry, brandish, and discharge firearms in furtherance of, or during and in relation to, a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (o).

-8-

Before trial began, Cabrera moved to sever his trial from that of his codefendants, claiming that the evidence regarding several of the murders was "spillover" evidence as to him and that he would be prejudiced by its introduction. The district court noted this motion; while it did not rule specifically at that time, the court proceeded to try all four defendants together, effectively denying the motion. On June 11, 2010, the jury found each defendant guilty on both counts.

Both after the close of the government's evidence and after the verdict, each defendant moved for a judgment of acquittal, on the ground that the evidence was insufficient to support conviction. Specifically, they argued that the evidence failed to prove that there had been one overarching conspiracy as charged, but rather showed that there had been multiple conspiracies. The jury had, at defendants' request, been instructed on multiple conspiracies. The district court denied each of these motions.

The district court held a separate sentencing hearing for each defendant. The relevant details of these hearings are recounted below. In all of the hearings, the court applied the "murder cross-reference" of U.S.S.G. § 2D1.1(d)(1) to reach an advisory Sentencing Guidelines calculation of life imprisonment for Count 1. This cross-reference provides that, for a drug trafficking crime, "[i]f a victim was killed under circumstances

that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States," then the court should "apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under" the drug trafficking guideline. U.S.S.G. § 2D1.1(d)(1).

For each defendant, the district court applied § 2A1.1, which resulted in a Guidelines sentence of life imprisonment. Finding this an appropriate measure of punishment for each defendant under 18 U.S.C. § 3553, the court sentenced each of them to life imprisonment on Count 1.[2]

### III.

A.      Sufficiency of the Evidence

All four of the defendants challenge the sufficiency of the evidence to support their convictions on Counts 1 and 2. See Fed. R. Crim. P. 29. We review each challenge de novo, asking "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005)

---

[2] The district court also sentenced each defendant to a ten-year term of imprisonment on Count 2, to be served consecutively. See 18 U.S.C. § 924(c)(1)(A)(iii), (c)(1)(D)(ii); U.S.S.G. § 3D1.1(b)(1). None of the defendants challenge their Count 2 sentences on appeal.

(quoting United States v. Richard, 234 F.3d 763, 767 (1st Cir. 2000)) (internal quotation marks omitted). "The court's only inquiry is whether the guilty verdict 'is supported by a plausible rendition of the record.'" Poulin, 631 F.3d at 22 (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)). We assume the credibility of all testimony favorable to the government. See United States v. Fenton, 367 F.3d 14, 18 (1st Cir. 2004).

Méndez, Rodríguez, and González present a common argument on the sufficiency of the evidence; Cabrera filed a separate brief with a similar point. Namely, they argue -- as they did in their motions for acquittal -- that the evidence did not prove that there was one single conspiracy, but rather that each defendant acted in the sole interest of his own drug sales. The argument is that there were many smaller conspiracies to distribute drugs, but not the cooperation and interdependence of an overarching conspiracy. They argue that there were separate brands of crack cocaine and marijuana, with different color-coded vials and baggies to maintain market differentiation.[3] This purported variance between the conspiracy charged in the indictment and the evidence presented at trial requires, they argue, acquittals for all defendants on all counts. We will reverse a conviction based on a variance in proof

---

[3] For instance, Méndez's vials of crack had blue caps, González's had green caps, and Cabrera's were smaller and had gold caps. Rodríguez's baggies of marijuana were purple, whereas Reyito's were green and other dealers used stickers.

-11-

only when there has been "prejudice to the defendant's substantial rights." United States v. Soto-Beníquez, 356 F.3d 1, 27 (1st Cir. 2004).

In determining whether a single conspiracy existed, we consider "the totality of the circumstances, paying particular heed to factors such as the existence of a common goal, evidence of interdependence among the participants, and the degree to which their roles overlap." Fenton, 367 F.3d at 19. An agreement to join a conspiracy "may be express or tacit . . . and may be proved by direct or circumstantial evidence," United States v. Rivera Calderón, 578 F.3d 78, 88 (1st Cir. 2009), including evidence of "acts committed by the defendant that furthered the conspiracy's purposes," United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994) (quoting United States v. Gómez-Pabón, 911 F.2d 847, 853 (1st Cir. 1990)) (internal quotation mark omitted). Further, "each coconspirator need not know of or have contact with all other members [of the conspiracy], nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martínez-Medina, 279 F.3d 105, 113 (1st Cir. 2002).

The evidence at trial easily permitted a reasonable jury to conclude that each of the four defendants was involved in a single conspiracy to distribute narcotics at La Recta. The evidence supported a finding that the defendants operated under a

common scheme, first headed by Méndez and then, under Méndez's control from prison, by his brother-in-law Cabrera, which divided authority to sell crack and marijuana among the various "drug owners." Despite selling different "brands" of crack and marijuana, the defendants shared common runners and sellers, coordinated at least some of their drug prices (including raising prices for the greater good of the overall conspiracy), and joined together to commit violent acts in order to prevent others from infringing on their drug business. This evidence was more than enough for the jury to infer an agreement. The government's evidence went far beyond showing that the defendants merely associated with one another. See Rivera Calderón, 578 F.3d at 89-90 (affirming jury's finding of a single conspiracy where defendants controlled who could sell at the drug point, set prices, and jointly defended the drug point from hold-ups).

The fact that the defendants sold crack vials with different-colored caps would not prevent a reasonable jury from finding that they worked together to maintain the drug conspiracy as a whole. See id. at 92. The evidence relating to the violence and murders vividly demonstrated that the defendants would band together to protect their group's status and exclusivity at La Recta. For instance, Cabrera and González both sold crack at La Recta (Cabrera on behalf of both himself and Méndez), apparently without any conflict between them, yet when another person, Indio,

began selling crack nearby, Cabrera and González formed a plan to kill him, and González eventually shot him to death. Agustín's murder likewise followed discussions among Cabrera, González, and Rodríguez about how to handle Agustín's disruptive behavior, and the defendants shared firearms among themselves and other conspirators in preparing to execute the murder.

This evidence, along with the other evidence regarding the murders of Rivera, Ortiz, and the Lloréns Torres dealers, likewise supports a reasonable jury's finding that each defendant conspired to use, carry, or possess firearms in furtherance of a drug trafficking crime. There was extensive testimony that Méndez, Gonzáles, and Rodríguez each discharged firearms with the purpose of protecting La Recta from threats to their business and/or expanding their drug operations. In the Agustín and Lloréns Torres murders, Gonzáles and Rodríguez even directly worked together to carry out the killings. Although the evidence did not show that Cabrera personally shot a firearm, witnesses testified that he had been seen carrying a gun at La Recta and that he helped distribute firearms for use in Agustín's murder.[4]

Under these circumstances, the jury's verdicts against all four defendants are "supported by a plausible rendition of the

---

[4] Cabrera argues that, while he was seen armed at the drug point, the evidence failed to show that he "used" firearms or that any "use" was during and in relation to drug trafficking. Since a jury could easily find that he did carry weapons to protect the drug point and thus further drug sales, the evidence suffices.

-14-

record."  Ortiz, 966 F.2d at 711.  The convictions must be affirmed.

B.        Sentencing Challenges

Three of the four defendants -- Méndez, Gonzáles, and Rodríguez -- challenge the district court's imposition of life sentences on Count 1.  As the defendants' claims vary in the applicable standards of review and in the arguments on which they rely, we take each defendant's claim in turn.

1.    Méndez

Recall that Méndez controlled the drug point at La Recta, and that he beat, shot, and murdered others in furtherance of the drug conspiracy.

Méndez's presentence investigation report ("PSR") attributed to him a drug quantity of 54 kilograms of crack cocaine, based on Sánchez's testimony about the amount of crack she had sold as a runner.  However, the PSR did not reach its base offense level recommendation by using this quantity.  Instead, it explained that, "since seven (7) victims were killed in order to keep control of the drug point and/or in an effort to take over the drug point in another housing project, a Cross Reference to USSG § 2A1.1 is authorized pursuant to USSG § 2D1.1(d)(1), establishing[] a base offense level of forty-three (43)."  The PSR then added 4 levels for Méndez's leadership role and 2 levels for using minors in the commission of the offense, for an adjusted offense level of 49.

But because the Guidelines treat an offense level greater than 43 as an offense level of 43, see U.S.S.G. ch. 5, pt. A, app. n.2, Méndez's final offense level was 43. His Guidelines sentence was life imprisonment.

Méndez filed written objections to the PSR, in which he argued, inter alia, that the recommendation of a life sentence was unreasonable. He noted that he had never been charged with the murders on which the cross-reference was based, and he argued that this situation presented a Confrontation Clause problem. He also asserted that the life sentence guideline allowed the government to circumvent the requirements of 18 U.S.C. § 3559(c), which addresses mandatory life sentences for certain repeat violent offenders. Finally, he argued that a life sentence conflicted with the purposes of sentencing under 18 U.S.C. § 3553. Méndez did not object to the PSR's use of the murder cross-reference (instead of the drug quantity) to establish the base offense level, but rather argued generally against any Guidelines recommendation of life imprisonment.[5]

At the sentencing hearing, Méndez's counsel recounted the defendant's difficult childhood and asked that the court consider a term of 30 years. Méndez's counsel did not allude to the murder

---

[5] The district court granted certain of Méndez's factual objections to the PSR, none of which is relevant to this appeal. In its ruling on the other objections, the court did not address Méndez's objection to the Guidelines recommendation.

cross-reference. And Méndez expressed no remorse in his allocution. The government, meanwhile, sought life sentences on both counts, given the extensive testimony about Méndez's violence, including murder, and the fact that he was responsible for the sale of at least 18 kilograms of crack cocaine each year during the life of the conspiracy.

The district court, in calculating the Guidelines range, applied the first-degree murder cross-reference, stating that "seven victims were murdered as a manner or means of furthering the conspiracy." It also applied the two enhancements suggested in the PSR and concluded that the Guidelines range was life imprisonment. The court then considered the § 3553(a) sentencing factors. While recognizing the hardships of Méndez's upbringing, the court concluded that Méndez had been "one of the major players of the drug trafficking organization" at La Recta. With regard to the murders, the court found:

> There is also video and testimonial evidence of Defendant Mendez Roldan's direct participation in the murder of Alexis Rivera Feliciano, also known as pata de palo and as gemelo, on January 7, 2003. Defendant is seen in the video of the January 7, 2003, shooting of Rivera Feliciano carrying a shoulder weapon, and a Government witness testified that she saw Defendant with a rifle shooting directly at Rivera Feliciano, and that in her presence Defendant said that Rivera Feliciano had been arrested by federal authorities, yet had served no time.
> There is also trial evidence that Defendant killed Luis A. Ortiz Santos, also known as Cleca, on May 27, 2003, not because

> Defendant suspected him to be an informant,
> like Rivera Feliciano, but in reprisal of
> Ortiz Santos' wife being an informant at the
> Canales housing project.
>     Now, this evidence established that
> these killings were in furtherance of the drug
> conspiracy charge.

Ultimately, the court found that the advisory guideline of life imprisonment adequately served the § 3553(a) purposes of punishment and deterrence in Méndez's case, and it imposed a sentence of life imprisonment on Count 1 and a consecutive sentence of ten years' imprisonment on Count 2.

On appeal, Méndez makes three types of arguments against the life imprisonment sentence. First, he argues that the district court made a procedural error in applying the murder cross-reference because the court allegedly "acted under the false and restricted notion that it lacked any discretion to impose a different sentence [than life imprisonment] because § 2D1.1(d)(1) necessarily prohibited any sentence other than natural life under custody." See United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008) (appellate review of a district court's sentence first entails asking whether the court made any "procedural errors," including "treating the Guidelines as mandatory" (quoting Gall v. United States, 552 U.S. 38, 51 (2007))). Because Méndez did not raise this objection before the district court, our review is only for plain error. See United States v. Colon-Nales, 464 F.3d 21, 26 (1st Cir. 2006). Plain error is a very difficult standard to meet:

the defendant must show "that the trial court committed an error, that the error was 'plain,' . . . that the error affected the substantial rights of the [defendant, and that] . . . the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 25 (quoting United States v. Olano, 507 U.S. 725, 736 (1993)).

Méndez's contention would fail under any standard of review, let alone the exacting standard of plain error. There is no evidence in the record that the district court believed a life sentence to be mandatory; to the contrary, the court specifically recognized the advisory nature of the Guidelines calculation. The court also explicitly considered potentially mitigating information under the § 3553(a) factors, though it ultimately rejected those arguments. And it plainly was correct in rejecting the proposition that, under § 3553(a), a sentence of life imprisonment is never permissible.

At oral argument in this appeal, Méndez offered a variation on his procedural challenge. This time, he asserted that the district court's error was its failure to make specific findings that Méndez's actions satisfied the first-degree murder requirements of 18 U.S.C. § 1111(a), which were necessary to support the application of § 2A1.1. He had not asked the district court for such findings. He also argued that the district court erred in failing to calculate a drug quantity, since without that

calculation the court could not have determined whether the murder offense level was "greater than" the drug trafficking offense level. See U.S.S.G. § 2D1.1(d)(1). These arguments, at best, call for plain error review, even assuming they were not waived.

We find no error in the district court's application of § 2A1.1. Although the court, when it articulated its Guidelines calculations, did not specifically explain its reasons for applying the first-degree murder cross-reference, the court made specific findings as to Méndez's role in two murders shortly thereafter, while explaining its sentence. These findings make it clear that the court concluded that Méndez met the premeditation scienter requirement for first-degree murder, and thus for application of § 2A1.1. See 18 U.S.C. § 1111(a) (defining first-degree murder as including, inter alia, any "willful, deliberate, malicious, and premeditated killing").

The court first explained the trial evidence showing that Méndez had formed plans to kill Rivera and Ortiz, and that he had participated in killing both victims because of the perceived threat they posed to the drug operation at La Recta. These findings were consistent with the unchallenged facts recited in Méndez's PSR. There is no doubt that the district court's statements reflect a finding that these murders were premeditated, and the evidence at trial was more than sufficient to support such a finding by a preponderance of the evidence. The court then

connected these planned murders to the § 2D1.1(d)(1) cross-reference by specifying that the killings were in furtherance of the drug conspiracy.

This was enough to support application of the cross-reference. Since § 2A1.1 imposes the highest offense level allowed by the Guidelines, no further calculation was necessary: the base offense level under § 2D1.1 necessarily would have been less than or equal to the offense level under § 2A1.1. Méndez thus faced an offense level of 43 regardless of whether it was grounded in the cross-reference or in § 2D1.1.[6]

Méndez's second argument is that the life sentence was substantively unreasonable. See Politano, 522 F.3d at 72-73 (even when there is no procedural error, the appellate court may review a district court's sentence for substantive reasonableness). Méndez argues that his sentence was unreasonable because the court failed to properly weigh the § 3553(a) factors and the sentence failed to fulfill the sentencing purposes of deterrence and rehabilitation.

---

[6] Méndez also challenges on appeal the imposition of the four-level increase for leadership, see U.S.S.G. § 3B1.1(a), and the two-level increase for use of a minor in the offense, see U.S.S.G. § 3B1.4. "We review the imposition of [a leadership] enhancement, and any predicate factual findings, for clear error." United States v. Appolon, 695 F.3d 44, 70 (1st Cir. 2012). Again, the offense level could go no higher than 43. Even if the enhancements had been in error -- a highly doubtful proposition, given the record -- they could not have affected Méndez's sentence. Thus, any error would have been harmless. See Martínez-Medina, 279 F.3d at 124.

Méndez -- age 30 at sentencing -- did raise these arguments at least in part in his objections to the PSR, although he did not renew all of them at the sentencing hearing. Even if we treat Méndez's objections as preserved, and accordingly evaluate them under an abuse of discretion standard, see United States v. Carrasco-de-Jesús, 589 F.3d 22, 26 (1st Cir. 2009) (citing Gall, 552 U.S. at 51), his arguments fail. When it comes to substantive reasonableness, "a sentencing court's ultimate responsibility is to articulate a plausible rationale and arrive at a sensible result." Id. at 30. The district court fulfilled that responsibility here.

The district court considered Méndez's counsel's arguments about Méndez's history, characteristics, and the possibility for rehabilitation if he were not given a life sentence. The court reasonably concluded that the nature and circumstances of the offense -- particularly the extensive evidence of Méndez's acts of violence -- meant that the Guidelines sentence properly reflected the needs for punishment and deterrence. This choice of emphasis among the statutory factors was well within the court's discretion. See United States v. Gibbons, 553 F.3d 40, 47 (1st Cir. 2009) ("We will not disturb a well-reasoned decision to give greater weight to particular sentencing factors over others . . . .").

Méndez makes a third set of miscellaneous arguments. He alleges that his sentence infringed his Confrontation Clause

rights; that it circumvented the requirements of 18 U.S.C. § 3559(c) and 21 U.S.C. § 851; and that, because he was not charged with murder in the indictment, it violated Apprendi v. New Jersey, 530 U.S. 466 (2000). The Apprendi argument rests on the fact that the indictment did not include murder as a charged offense, although it did allege the murders as among the overt acts committed in furtherance of the charged conspiracy. Again, Méndez raised some of these arguments in his objections to the PSR but did not renew them at the sentencing hearing. At any rate, however, these arguments misapprehend the relevant law. We take the arguments in turn.

First, the jury found that the quantity of crack cocaine involved in the Count 1 conspiracy was fifty grams or more, which, at the time of the conviction, triggered a statutory maximum sentence of life on Count 1. See 21 U.S.C. § 841(b)(1)(A)(iii) (2010). Méndez's Apprendi argument fails because Apprendi provides only that a jury must find any facts (other than a prior conviction) that would increase the penalty for a crime beyond the otherwise applicable statutory maximum. See 530 U.S. at 490. In fact, we have previously rejected the specific Apprendi argument that Méndez makes.[7] See United States v. Newton, 326 F.3d 253, 266

_____

[7] González and Rodríguez purport to "join" Méndez's Apprendi-based due process argument. Even if we assume that this statement is enough to avoid waiving the issue, we reject the argument as to González and Rodríguez for the same reasons stated in the text as to Méndez.

-23-

(1st Cir. 2003) ("[Defendant] now requests that we expand Apprendi to require juries to find beyond a reasonable doubt that the defendant committed murder before the sentencing court is permitted to apply the 'cross-reference' provision of section 2D1.1(d)(1). We decline this invitation to expand Apprendi . . . .").

Second, 18 U.S.C. § 3559(c) and 21 U.S.C. § 851 are irrelevant to this case. Those provisions address mandatory life sentences for certain repeat violent offenders and the procedural requisites for increasing sentences based on prior convictions. Here, the government did not seek, nor did the district court purport to impose, a mandatory life sentence based on Méndez's prior convictions. As noted above, the court repeatedly acknowledged that the Guidelines range of life imprisonment was advisory, and it was based on Méndez's culpability for the present offense. Finally, there was no Confrontation Clause problem with the sentence. Méndez does not allege that he was denied the opportunity to confront witnesses against him during his trial, and the district court's sentence was based on facts established at that trial.

2.    González

To recap, González came to La Recta from Lloréns Torres in early 2004, distributed cocaine at La Recta as part of Méndez's operation, participated in a shootout at the Calle 4 drug point, murdered Indio, and participated in the murder of Agustín.

As with Méndez, González's PSR attributed to him a drug quantity of 54 kilograms of crack cocaine, then used the first-degree murder cross-reference to reach a base offense level of 43. The PSR then added 4 levels for González's leadership role and 2 levels for using minors in the commission of the offense, for an adjusted offense level of 49, which was treated as an offense level of 43. González's Guidelines sentence was life imprisonment.

González filed objections to the PSR, in which he argued, inter alia, that the leadership enhancement was excessive because he was not the main leader of the conspiracy, and that, "in the interest of justice," the murder cross-reference should not be applied because he had been acquitted of the murders in state court and the government's witnesses were unreliable. González conceded that the § 2A1.1 cross-reference was "authorized . . . in the instant case."

The district court denied these objections in a written order before the sentencing hearing. It found that González qualified as a leader under the standard articulated in United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995), regardless of whether he was the "top" leader. The court also found that González's acquittal in state court was irrelevant because the evidence at the federal trial had "abundantly established both that seven murders were committed in order to further the interests of the drug conspiracy, and that [González]

-25-

participated either in the planning or execution of four of those murders" -- those of Indio and the three Lloréns Torres dealers -- such that the district court could find by a preponderance of the evidence that the cross-reference applied.

At his sentencing hearing, González -- then age 37 -- did not renew his objections. Indeed, at his instruction, his counsel did not make arguments. González stated in his allocution that he had had a religious conversion and was now a different man; he needed to be free in order to help others.

In calculating the Guidelines range, the district court applied the first-degree murder cross-reference, stating that "seven victims were murdered as a manner or means of furthering the conspiracy." It also applied the two enhancements and concluded that the Guidelines sentence was life imprisonment. The court then considered the § 3553(a) factors. It recounted González's history of violent crime and admitted drug use, as well as his leadership role at La Recta. With regard to his personal participation in the murders, the court found:

> The Defendant also planned and executed the murders of several persons to further the interests [o]f the drug conspiracies. He personally participated in the planning and execution of the killings of Richard Figueroa Perdomo, also known as El Indio, Charles West Isaac, Melvin Reyes Rivera and Oneill Irizarry Mendoza, as a means of advancing the conspiracy.

The court concluded that life imprisonment adequately reflected the "very serious nature of the offenses" as well as González's history and characteristics. The court noted that, while González's religious awakening was "encouraging," this did not "erase the extreme gravity of the criminal behavior that brought him as a Defendant before this Court." González received a sentence of life imprisonment on Count 1.

On appeal, González argues that the district court erred in applying § 2A1.1 because the court's findings were insufficient on the question of whether he had the requisite mental state for first-degree murder. This argument is unpreserved, and the standard of review is plain error. See Colon-Nales, 464 F.3d at 26.

We conclude that the district court's findings supported the application of the first-degree murder cross-reference. While the court did not delve into the trial evidence in detail, it clearly stated that González "planned" and helped to commit four murders. The court had also already found, in its order prior to the sentencing hearing, that the trial evidence "certainly established by a preponderance that the co-defendants tried to overtake [the Calle 4] drug point to expand their drug business and that [González] participated in that quest." These statements clearly evince a finding of premeditation, and the trial evidence supports such a finding. González, along with Cabrera,

masterminded the shooting of the three men at the Calle 4 drug point and the plan to kill Indio. The Calle 4 attack was intended to eliminate competition and protect the defendants' own drug trafficking activity. In both cases, González recruited other members of the drug conspiracy to assist him in committing the murders, and in both cases González later bragged about his participation.[8]

González also challenges the imposition of the leadership enhancement, arguing that the testimony at trial was that Méndez was the leader of the conspiracy. Even when such a challenge is preserved, "[w]e review the imposition of this particular sentencing enhancement, and any predicate factual findings, for clear error." United States v. Appolon, 695 F.3d 44, 70 (1st Cir. 2012). There was no such error. The relevant inquiry is only whether González was a leader of the conspiracy, not whether he was the leader. There can be more than one leader of a conspiracy. See United States v. Rodríguez-Lozada, 558 F.3d 29, 45 (1st Cir. 2009). The trial evidence revealed that González both led a team that sold crack at La Recta and led various conspiracy members in plans to murder Indio, Agustín, and the Lloréns Torres dealers. The district court found that the evidence at trial "clearly established" that five or more people participated in the

_____

[8] In addition, the trial evidence demonstrated that González planned and helped to execute the murder of Agustín, during which González distracted the victim while Rodríguez shot him.

-28-

conspiracy; that González was one of the "key players" in the conspiracy; that he helped plan four murders in furtherance of the conspiracy; and that he, "along with other codefendants, engaged in virulent conduct to eliminate competition . . . and to protect their own drug trafficking activities." On this record, we cannot say that imposition of the leadership enhancement was clearly erroneous.

Moreover, given our conclusion that the district court properly applied § 2A1.1, the imposition of the leadership enhancement is immaterial to González's sentence, since even before the enhancement he was already subject to the highest offense level of 43. Thus, even if there had been error in adding four levels for leadership -- and there was not -- it would have been harmless error. See Martínez-Medina, 279 F.3d at 124.

3.    Rodríguez

Again, Rodríguez personally sold multiple pounds of marijuana each week at La Recta as part of the drug conspiracy; he participated in the triple murder at Calle 4; and he helped plan the murder of Agustín, whom he shot in the head.

Rodríguez's PSR attributed to him the conspiracy-wide drug quantity of 54 kilograms of crack cocaine, then used the first-degree murder cross-reference to reach a base offense level of 43. The PSR then added 2 levels for Rodríguez's leadership role and 2 levels for using minors in the commission of the offense, for

an adjusted offense level of 47, which was treated as an offense level of 43. Rodríguez's Guidelines sentence was life imprisonment.

In his sentencing memorandum, Rodríguez did not object to the PSR's Guidelines calculations, arguing instead that the court should impose a variant sentence. He also argued that the PSR erred in treating him as part of the conspiracy charged in the indictment, but the district court rejected this argument, noting that it was insupportable in light of the jury's verdict. The court also found that the evidence at trial supported the PSR's conclusions that "the violent deaths and possession of firearms in connection to the drug point at La Recta were proved to be a joint effort by the defendants to further their common interest of protecting the drug point and expanding their illegal drug trafficking activities," and that the conspirators had "shar[ed] and exchang[ed] . . . weapons during the planning of Agustín['s] and Indio's murder[s]."

At the sentencing hearing, Rodríguez's counsel discussed Rodríguez's difficult background, including child abuse, illiteracy, and emotional problems, and urged the court to consider his potential for rehabilitation. Rodríguez -- age 30 at the time -- argued at allocution that he was innocent of the crimes charged, that the four videos of him at La Recta did not show he was armed, that the testimony against him was false and secured by

promises of reduced prison sentences, and that he had never admitted that he had shot Agustín. Rodríguez neither accepted responsibility nor showed any remorse.

In calculating the Guidelines range, the district court applied the first-degree murder cross-reference, based on the murder of seven victims "as a manner or means of furthering the conspiracy." It also applied the two-level leadership enhancement because Rodríguez had "supervised other sellers," as well as the two-level enhancement for use of a minor. The court concluded that the Guidelines sentence was life imprisonment. The court then considered the § 3553(a) factors. It acknowledged Rodríguez's difficult childhood, lack of education, and drug addiction, but also found that Rodríguez was part of a "violent drug trafficking organization." With regard to the murders, the court found:

> Now, during the life of that conspiracy, the Defendant -- and the co-conspirators charged -- planned and executed the deaths of several persons to further that drug conspiracy, and the Defendants engaged in unrelenting ruthless conduct to further their common interests. Defendants would also jointly plan, as part of the conspiracy, to murder outsiders in order to eliminate competition and to expand their drug activity beyond the territorial confines of the Canales housing project.
> According to the testimonies at trial, the Defendant, Rodriguez Reyes, personally participated in the planning or in the execution of some of these murders, such as, the killing of Richard Figueroa Perdomo, known

> as Indio, and of Jose A. Medina Nieves, known
> as Agustin.[9]
>
> Now, this conduct, the Court understands, is a reflection of a total disregard by Defendant of human life, and it also points to recurrent virulence.

The court concluded that the advisory Guidelines sentence of life imprisonment adequately reflected the nature of the offenses, Rodríguez's history and characteristics, and the need for punishment and deterrence. The court sentenced Rodríguez to life imprisonment on Count 1.

Rodríguez argues on appeal that the district court committed procedural error by failing to make specific findings about the parts of the conspiracy's conduct for which Rodríguez could be held personally responsible. He claims that this error caused the court to incorrectly calculate the Guidelines range. Because Rodríguez did not object to the Guidelines calculations or to the sufficiency of the court's findings until this appeal, the standard of review is plain error.

Rodríguez first objects to the PSR's drug quantity calculation, arguing that he cannot be held responsible for the conspiracy-wide quantity of crack. However, the district court did not rely on the drug quantity in reaching Rodríguez's sentence; rather, the court applied the cross-reference to § 2A1.1. And with regard to the murders on which the court based the use of the

---

[9] As described below, the court's statement was in error as to the murder of Indio.

cross-reference, the court did make specific findings as to Rodríguez's personal involvement and responsibility.

Admittedly, the district court erred in its identification of the murders with which Rodríguez was involved. The court stated that Rodríguez had participated in the planning and execution of the murders of Indio and Agustín, but the government concedes that Rodríguez was not involved in Indio's murder. However, the court correctly found that Rodríguez had helped to plan and execute the Agustín murder; indeed, the evidence at trial showed that Rodríguez was part of the group that decided to murder Agustín and that Rodríguez was the one who ultimately shot Agustín in the head. That finding alone would support the application of the first-degree murder cross-reference, rendering a drug quantity finding superfluous. Further, the district court also would have been entitled to rely on the unchallenged finding in the PSR that Rodríguez participated in the triple murder at the Lloréns Torres drug point. The error thus did not affect Rodríguez's substantial rights, and we will not vacate the sentence.

To the extent that Rodríguez challenges the substantive reasonableness of the district court's sentence, there was no error. Rodríguez challenges the district court's balancing of the § 3553(a) factors, but as we noted with regard to Méndez, "[w]e will not disturb a well-reasoned decision to give greater weight to

particular sentencing factors over others."  Gibbons, 553 F.3d at 47.  Given the district court's findings about the violent nature of the drug conspiracy and Rodríguez's participation in at least one murder, it was not unreasonable for the district court to weigh the need for punishment and deterrence over the potentially mitigating effects of Rodríguez's personal background.

C.      Motion for New Trial

While Cabrera does not challenge his sentence, he does advance an additional argument not asserted by his codefendants: that he is entitled to a new trial because the district court erroneously denied his motion for severance.  He argues on appeal, as he did in his original motion, that he was prejudiced by "spillover" evidence about those of the seven murders in which he played no role.

This court reviews the denial of a motion to sever for abuse of discretion.  Soto-Beníquez, 356 F.3d at 29.  "To demonstrate abuse of discretion, [a] defendant[] must show that joinder deprived [him] of a fair trial, resulting in a miscarriage of justice."  Id.  "Because the general rule is that those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources, severance is particularly difficult to obtain where, as here, multiple defendants share a single indictment."  Id.

The district court did not abuse its discretion in trying Cabrera along with his three codefendants. The evidence of the murders presented at trial was not so unrelated to Cabrera's conduct that its admission was prejudicial to him at all, let alone so prejudicial that it constitutes a miscarriage of justice. Cabrera directly participated in the decisions to murder Indio and Agustín, as well as in the planning of the Lloréns Torres shootout that killed three others. The evidence further established that Cabrera was a leader in the drug conspiracy and that all seven murders were committed in furtherance of that conspiracy. The murder evidence thus would have been admissible against Cabrera even in a separate trial. See United States v. Levy-Cordero, 67 F.3d 1002, 1007-08 (1st Cir. 1995).

IV.

The convictions and sentences of Melvin Méndez-Roldán, José Cabrera-Cosme, Héctor González-Suárez, and Jerry Rodríguez-Reyes are all affirmed.