# United States Court of Appeals
## For the First Circuit

No. 12-1278

UNITED STATES,

Appellee,

v.

BALDWIN IHENACHO,

Defendant, Appellant.

No. 12-1661

UNITED STATES,

Appellee,

v.

GLADYS IHENACHO,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Howard, Circuit Judges.

Michelle L. Dineen Jerrett, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, and Shelbey D. Wright, Assistant United States Attorney, were on brief, for appellee in No. 12-1278.

David M. Lieberman, Attorney, U.S. Department of Justice, with whom Carmen M. Ortiz, United States Attorney, Shelbey D. Wright, Assistant United States Attorney, Michelle L. Dineen Jerrett, Assistant United States Attorney, Mythili Raman, Acting Assistant Attorney General, U.S. Department of Justice, and Denis J. McInerney, Acting Deputy Assistant Attorney General, U.S. Department of Justice, were on brief, for appellee in No. 12-1661.

Brian M. LaMacchia, with whom David J. Apfel and Goodwin Procter LLP were on brief, for appellant Baldwin Ihenacho.

Daniel J. Cloherty, with whom Victoria L. Steinberg and Collora LLP were on brief, for appellant Gladys Ihenacho.

June 17, 2013

**LYNCH, Chief Judge**.  Baldwin and Gladys Ihenacho are husband and wife, and were the owners and operators of a neighborhood pharmacy in Dorchester, Massachusetts.  Baldwin and Gladys were convicted of dispensing and shipping drugs to customers pursuant to invalid online prescriptions for Internet pharmacy operations over a period from 2006 to 2008.  Those operations were headquartered in the Dominican Republic.

Baldwin pled guilty to nearly all of the charges against him (the remaining charge was dismissed) and was sentenced to 63 months in prison.  On appeal, he challenges the application of the fraud sentencing guideline to him.  The most serious challenge, which we ultimately reject, is to the district court's calculation of the loss caused by his offenses.  That calculation goes to the applicable guideline sentencing range and increased the length of his sentence.

Gladys went to trial and a jury convicted her of eight counts, including for distributing controlled substances, international money laundering, and conspiracy.  She was then sentenced to thirty days' imprisonment. On appeal, she challenges the sufficiency of the evidence supporting her convictions, particularly disputing whether the government proved that she knew her pharmacy was dispensing drugs pursuant to invalid prescriptions.  The evidence was ample.

We affirm Baldwin's sentence and Gladys's convictions.

In considering a sentencing appeal that follows after a guilty plea, we take the relevant facts from the plea agreement, the change-of-plea colloquy, the presentence investigation report (PSR), and the transcript of the sentencing hearing. United States v. Fernández-Cabrera, 625 F.3d 48, 50 (1st Cir. 2010). In contrast, in evaluating a claim that the evidence was insufficient to support a conviction after trial, we consider "the facts in the light most favorable to the verdict." United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011). We describe the facts relevant to Baldwin's guilty plea and sentence. We recount the relevant facts from Gladys's trial in the light most favorable to the jury's verdict.

A.      Facts Relevant to Baldwin's Guilty Plea and Sentence

Baldwin was born in Nigeria in 1953 and immigrated to the United States, became a U.S. citizen, and obtained his pharmacist's license in Massachusetts. He owned and operated Meetinghouse Community Pharmacy ("Meetinghouse"), a building containing a pharmacy in Dorchester, from 1994 to 2008.

    1.      Baldwin's Agreements with Global Access Group and
            Golden Island Investment

Between September 2006 and November 2008, Meetinghouse filled thousands of online drug orders for several Internet pharmacy operations, including two located in the Dominican Republic: Global Access Group ("Global Access") and Golden Island

Investment ("Golden Island"). Baldwin conspired with Jack Palasy and Tony Reyes as to Global Access, and Reyes and others as to Golden Island, to distribute controlled and non-controlled substances to persons who ordered them online by filling out questionnaires via these Internet pharmacies. The pharmacies provided drugs without valid prescriptions.

Under federal Drug Enforcement Administration regulations, prescriptions for controlled substances are not effective unless "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). A pharmacist has a corresponding responsibility for the proper dispensing of controlled substances. Issuing prescriptions based solely on online questionnaires falls outside the usual course of medical practice, making such prescriptions invalid. See United States v. Lovern, 590 F.3d 1095, 1101 (10th Cir. 2009) (collecting cases).

As to penalties, a "person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04(a). These provisions of law make it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). For offenses, such as

Baldwin's, involving "any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 10 years." Id. § 841(b)(1)(E)(i).

Baldwin dispensed both controlled substances and non-controlled substances based on Internet orders. With respect to a drug, whether controlled or non-controlled, which is "not safe for use except under the supervision of a practitioner licensed by law to administer such drug," the act of dispensing a drug without a valid prescription "shall be deemed to be an act which results in the drug being misbranded while held for sale" under 21 U.S.C. § 353(b)(1). Section 331(a) prohibits "[t]he introduction or delivery for introduction into interstate commerce of any . . . drug . . . that is adulterated or misbranded." If any person "commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years." Id. § 333(a)(2).

2.    The Internet Pharmacies' Operations

To purchase drugs by way of Global Access or Golden Island, customers would go to Internet pharmacy websites operated by Global Access or Golden Island and enter their names, addresses, and credit card information, and answer a limited online questionnaire.[1] Each website's operator would then either (1)

_____

    [1] This questionnaire asked for information such as age, weight, height, medical allergies, other medications being taken, and whether the customer was pregnant.

-6-

forward this information to doctors who would, without seeing the customer, approve the orders for a fee, or (2) use the names and electronic signatures of a doctor or doctors to indicate approval of the orders, even though the approval was without these doctors' authorization.[2] Customers submitting orders to Global Access and Golden Island were not seen by and had no interaction with the doctors who purportedly approved their orders.

The "approved" orders were then sent to pharmacies, including Meetinghouse, for the prescription drugs to be dispensed. For each customer, Meetinghouse would download from the Global Access and Golden Island websites: (1) a mailing label; (2) a drug information label; and (3) a drug order that would remain with the pharmacy. The drug information labels included the name of the dispensing pharmacy and of the physician who had purportedly prescribed the drug. Once the pharmacy filled the vials for an order, it would affix the drug information labels to the vials and place the vials in an express mail package along with an insert concerning the medication that was provided by Global Access or

---

[2] At Baldwin's change-of-plea hearing, he conceded that he had constructive knowledge "that it was highly, highly unlikely that a doctor who . . . is a legitimate doctor in one state could prescribe drugs in 50 states," and that doctors "were not actually visiting with or seeing the patients for whom they were making the prescriptions." He denied having constructive or actual knowledge that "doctors' identities [were] being used where the doctors themselves were not signing off" on prescriptions for Global Access and Golden Island.

Golden Island. The pharmacy would then attach the mailing label and send the package to the customer.

Many customers of online pharmacies could not obtain these medications by valid prescriptions and so choose these pharmacies. Many of Meetinghouse's Internet customers had drug addictions that were exacerbated by the easy availability of prescription drugs that could be purchased via the Internet without valid prescriptions from a physician.

At Meetinghouse, Baldwin, three regular employees, and several temporary employees dispensed and distributed prescription drugs for Global Access and Golden Island customers. Baldwin exercised decision-making authority over how drug orders would be filled and how much Meetinghouse would accept from the Internet pharmacies for dispensing drugs. The drugs Meetinghouse shipped to customers were not adulterated or counterfeit and were chemically consistent with the substances that they purported to be. Meetinghouse purchased the drugs wholesale from manufacturers, and received both a dispensing fee from Global Access and Golden Island of between $5.25 and $30 per order, and reimbursement for the cost of the drugs prescribed.

### 3. The Scale of Meetinghouse's Internet Operations

At the height of Meetinghouse's Internet operations, it filled twenty-five percent of its prescriptions for walk-in customers, while seventy-five percent of its drug orders were for

Internet pharmacies. According to Meetinghouse's records, it dispensed over a million pills to Global Access and Golden Island customers -- including more than 900,000 pills of Schedule III or Schedule IV controlled substances -- and about 3.4 million pills to Internet customers in general.

To pay the Ihenachos for dispensing drugs pursuant to online orders, Global Access wired $1,883,950 to Meetinghouse bank accounts and Golden Island wired $311,221.27 into accounts registered to Meetinghouse or to Gladys. These wire payments originated in the Dominican Republic. Three other Internet pharmacies, for whose activities the Ihenachos were not charged but which constituted relevant conduct, wired $1,039,677.63 to Baldwin, Baldwin's brother in Nigeria (upon the Ihenachos' instructions), and Meetinghouse as payment for filling online orders for controlled and non-controlled substances. The Ihenachos or their designees thus received $3,234,848.90 in total from all of the Internet pharmacy operations with which they were involved.[3]

When several banks closed bank accounts registered to the Ihenachos or Meetinghouse because of suspicious activity, the Ihenachos opened new accounts at different banks and instructed their co-conspirators at Internet pharmacy operations to structure transfers of money so as to attract less attention from the banks.

---

[3] Baldwin emphasized at his plea hearing that "the lion's share of this money is money that's actually used to buy the pharmaceuticals that are then dispensed."

4.    Baldwin's Knowledge of the Illegality of the Operations of Global Access and Golden Island

Baldwin was aware that the drugs that Meetinghouse dispensed for Global Access and Golden Island were being sold via the Internet. Indeed, Baldwin and his employees logged onto the Global Access and Golden Island websites to download orders for customers.

While Baldwin raised some questions about the legitimacy of the operations, he continued to fill prescriptions. In September 2006, Baldwin noted in an email to Palasy the fact that only one doctor appeared to be approving orders for all of Global Access's customers "no matter [in] which state the patient is located," and that this violated federal law unless "this doctor is registered in all USA states." He nonetheless continued to fill prescriptions. In a November 2006 email to Palasy, Baldwin stated that he had been informed by "the DEA [Drug Enforcement Administration] and the Massachusetts Board of Pharmacy . . . that Internet prescription is illegal" because "[t]here is no doctor patient contact." Baldwin continued asking Palasy questions about Global Access's operations until the spring of 2007, but then ceased questioning Palasy while continuing to dispense drugs for Global Access. Baldwin made no attempt to verify that the prescriptions Meetinghouse was filling for Global Access and Golden Island were valid.

Between the summer of 2007 and the summer of 2008, Baldwin received letters from the DEA and the states of New Hampshire, Arkansas, Missouri, and Utah, each of which warned him that Internet pharmacy operations were illegal. Baldwin also received a letter from individuals in Hawaii stating that they were going to report him to the Attorney General of Massachusetts for his Internet pharmacy activities. Baldwin ordered his employees at Meetinghouse to stop shipping to all six of these states, but only those states. He otherwise continued filling Internet orders for controlled substances for Global Access and Golden Island even after receiving these letters.

B.      Additional Facts Relevant to Gladys's Convictions

Gladys, born in 1966, is also a native of Nigeria. She married Baldwin in 1984, immigrated to the United States, obtained a nursing license, and became a U.S. citizen.

1.      Golden Island's Operations

At Gladys's trial, the government presented evidence as to the Internet pharmacy operations of Global Access, Golden Island, and Meetinghouse that mirrored the information presented in Baldwin's guilty plea hearing, PSR, and sentencing hearing. Because Gladys was ultimately only convicted of offenses involving Golden Island (and not those involving Global Access), we focus on that evidence.

Tony Reyes was the CEO of Golden Island Investments, and Golden Island ran a website through which customers could order prescription drugs without interacting with or being examined by a physician.  Every Golden Island prescription had purportedly been approved by the same physician: a Dr. Naomi Burr.  However, Dr. Burr testified at trial that she had never worked for Golden Island, approved prescriptions for Golden Island, or examined Golden Island customers.

2.      The Agreement Among Baldwin, Gladys, and Reyes

The government introduced an email from Baldwin, and referring to Gladys, which described Meetinghouse's agreement with Golden Island:

> You see, Tony had told me even before he left Jack [Palasy] that he wanted to open his own business and that he wanted my help in buying and shipping orders for him. . . . In fact, I told Tony that I will get back to him because I needed to consult with my partner in this business, my wife who owns 60 percent of the shares of our pharmacy.  I did not get back to Tony and I did it on purpose because I wanted to see how serious he was.  He more like called me everyday regarding this issue.  I eventually spoke with my wife who vehemently refused to do anything with anyone who knows Jack Palasy.[4]  I did my best to convince her that it is not fair to prejudge anyone or get the impression that because A and B are related, therefore, if A is bad then B must be bad.  I put up a good argument and eventually convinced my wife.  Meanwhile, Tony kept calling and in several of our conversations, he said to me: I am not Jack, and I will never treat you the same way Jack treated you.  Just ship

_____

[4] There was evidence that Gladys was upset with Palasy because he sometimes failed to pay Meetinghouse for dispensing and shipping Global Access's Internet drug orders.

-12-

30 orders per day for me, and I will pay you $55 per
order.

Meetinghouse dispensed and shipped hundreds of packages of
prescription drugs on behalf of Golden Island.

     3.     <u>Gladys's Management and Ownership of Meetinghouse
and Involvement in its Internet Operations</u>

Gladys incorporated and opened Meetinghouse with Baldwin
in 1994. At that time, she owned a 50% stake in the corporation
and was listed on its articles of incorporation as treasurer and
co-director. Gladys later increased her ownership of Meetinghouse
to 60%. Though Gladys relinquished her position as an officer of
Meetinghouse in 2001, she continued to present herself as an
officer in corporate resolutions and signature cards for
Meetinghouse bank accounts.

Gladys was involved in Meetinghouse operations before it
began dispensing drugs through online orders. She sometimes signed
employee paychecks, and was in charge of the pharmacy when Baldwin
traveled overseas. Baldwin traveled overseas on several occasions,
including to Nigeria, between September 2006 and November 2008.
Once Meetinghouse began filling Internet orders in 2005, Gladys's
involvement in its operations increased. She visited Meetinghouse
more frequently, called to make sure Internet prescriptions had
been filled, and told employees not to ship Internet prescriptions
to certain people or states. She also counted pills and put them
in vials to fill Internet orders.

Gladys had a prominent role in managing Meetinghouse's Internet business, including its operations for Golden Island. Between late August and early October 2008, Gladys sent four different emails to Reyes concerning Golden Island in which she complained that wire payments to Meetinghouse had been delayed, demanded that more payments be made, and threatened to delay shipment of orders if payments were not received.

Moreover, in emails to Reyes concerning Golden Island, Baldwin referred to Gladys as his "partner in this business." He explained that in his absence she would "run the financial aspects of my business as well as helping out with making sure that your orders are filled and shipped." Baldwin instructed Reyes that Golden Island payments should be sent both to Gladys's account and Baldwin's business account.

Between 2006 and 2008, Golden Island wired a total of $311,221.27 into accounts held by Meetinghouse, Baldwin, and Gladys, including $10,000 wired directly into Gladys's personal account on September 19, 2008. Between October 2006 and October 2008, Gladys personally received $272,795 from Meetinghouse accounts and receipts.

4.     Gladys's Receipt of the Missouri Warning

As said, several states sent warnings to Meetinghouse stating that Internet pharmacy operations were illegal. These

included an August 12, 2008 cease and desist warning from the

Missouri Board of Pharmacy, which said:

> The Missouri Board of Pharmacy is in receipt of an investigation report involving Meeting House Community Pharmacy, 248 Bowdoin Street, Dorchester, MA 02122, based on a Missouri consumer's on-line purchase of a prescription drug via the Internet. Specifically, a Missouri consumer completed a patient questionnaire on the "www.pillsless.net" website, and subsequently received #90 Carisoprodol 350 mg. The prescription label and enclosed receipt showed the prescription was dispensed by Meeting House Community Pharmacy, 248 Bowdoin Street, Dorchester, MA 02122.
>
> . . .
>
> Meeting House Community Pharmacy is, or was, actively engaged in a continuing course of conduct whereby prescription drug orders ("prescriptions") are dispensed based solely on an on-line questionnaire, with no physician-patient relationship. There was no physical evaluation of the individual seeking the drug product, nor was there any direct communication between that individual and the prescriber.
>
> The pharmacist-in-charge of the pharmacy and/or owner of the pharmacy knew or should have known that prescriptions obtained in this manner are not created pursuant to a valid prescriber/patient relationship. Therefore, such prescriptions are invalid.

Baldwin was traveling when Meetinghouse received the

Missouri cease and desist warning. Gladys was informed that the

warning letter had arrived, and came and picked it up from the

pharmacy. On the envelope in which the Missouri warning was

enclosed, Gladys wrote the following[5]:

---

[5] At trial, the government surmised in its closing argument that Gladys had written these notes during a phone conversation with Baldwin.

Communicate to the sender of this letter to inform that
pharmacist not available until next wk tuesday so they
can note & give more time to respond to letter

. . .

(1) which state DR writes from

(2) Contact Matt or Paul or Tom & fax letter to them

(3) Have all displayed medicines for online & put them
away[;] Can display Motrin antibiotics on
counter[;] Put away all the on line meds out of
site [sic]

(4) Pack box all rejected envelops [sic] & label for
credit send down stairs

Gladys wrote to the Missouri Board of Pharmacy on August 18, 2008, asking for an extension of time to respond to the warning. On August 20, 2008, Baldwin sent a letter to the Board stating that he had "immediately ceased any kind of pharmacy practice to any Missouri resident what so ever."

Until November 2008, Meetinghouse continued to ship orders for Internet pharmacies to states as to which it had not received warning letters. In particular, Meetinghouse sent prescription medications to five Golden Island customers in September 2008. After receiving the warning letter from the Missouri Board of Pharmacy, Gladys sent emails to Reyes demanding payment from Golden Island, and received a wire payment of $10,000 from Golden Island.

-16-

On March 31, 2011, a grand jury returned a third superseding indictment against Baldwin, Gladys, and five other defendants. With respect to Global Access, Baldwin and Gladys were charged with: one count of conspiracy to misbrand drugs, in violation of 18 U.S.C. § 371; and five counts of misbranding drugs, in violation of 21 U.S.C. §§ 331(k), 333(a)(2), and 353(b)(1). With respect to Global Access and Golden Island, Baldwin and Gladys were charged with the following counts for each Internet operation: one count of conspiracy to distribute and dispense controlled substances, in violation of 21 U.S.C. § 846; five counts of distributing and dispensing controlled substances, in violation of 21 U.S.C. § 841(a)(1); one count of conspiracy to commit international money laundering, in violation of 18 U.S.C. § 1956(h); and five counts of international money laundering, in violation of 18 U.S.C. § 1956(a)(2). Gladys and Baldwin were also charged with one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848.

A.      Baldwin's Guilty Plea and Sentence

On August 18, 2011, Baldwin pled guilty to all charges except for the count of conducting a continuing criminal enterprise. At Baldwin's sentencing, the court applied an 18-level enhancement for fraud to Baldwin's base offense level, using the "gross figure" for the revenues Baldwin received from his offenses

rather than "adjust[ing] to reflect . . . the cost of doing business." Baldwin challenged whether the fraud guideline was applicable to his offenses at all, and if so whether gross revenues were an appropriate basis for applying the guideline, but the court rejected his objections. The court applied two more enhancements urged by the government and rejected two other proposed enhancements. It applied a two-level adjustment downward for acceptance of responsibility, and stated that it was "puzzled by the government's insistence that the one point additional adjustment downward for acceptance of responsibility not be awarded."

The court then pronounced sentence:

So if I applied my calculation to the Guidelines, they actually come out pretty much where I would come out under 3553(a); that is, a sentencing range based on an offense level adjusted, as I see it, of 26, which would counsel a 63- to 78-month sentence.

I cannot award the additional point, which I otherwise would have, for acceptance of responsibility, but I can sentence at the lowest end of the guideline range, and that is the sentence I am going to impose; that is, a sentence of 63 months.

Baldwin timely appealed the court's judgment.

B.      Gladys's Trial, Conviction, and Sentence

Following a fourteen-day trial, a jury convicted Gladys of one count of conspiracy to distribute, dispense, and possess with the intent to distribute controlled substances; five counts of distributing and dispensing controlled substances; one count of

-18-

conspiracy to commit international money laundering; and one count of international money laundering. Each of these counts concerned the Golden Island Internet pharmacy and involved offenses that took place at least in part after August 2008, when Gladys received the Missouri warning letter. The jury found Gladys not guilty of all the remaining counts, which concerned the other Internet pharmacy, Global Access.[6] Gladys filed a post-trial motion for acquittal or, in the alternative, for a new trial, which the district court denied.

The court sentenced Gladys to 30 days of confinement -- with 20 days deemed served and the remaining 10 days to be satisfied by home detention -- and 3 years of probation. Gladys timely appealed the judgment of conviction. She does not appeal from her sentence.

### III.

Baldwin challenges his sentence on two separate grounds: (1) the district court should not have sentenced him under the fraud guideline, and (2) the court erred in determining the amount of loss for purposes of the fraud guideline.

---

[6] At the close of the government's evidence, the district court granted Gladys's motion for acquittal on the count of conducting a continuing criminal enterprise.

A.          Application of the Fraud Guideline

We review the court's interpretation and application of the Guidelines de novo. United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008). Baldwin concedes that the fraud guideline, U.S.S.G § 2B1.1, "applied as a technical matter" to his case, but argues that the court erred in applying the guideline because his case was "never about fraud." He is wrong.

Baldwin pled guilty to violations of 21 U.S.C. §§ 331(k) and 333(a)(2). Appendix A to the U.S. Sentencing Guidelines prescribes that the appropriate guideline for these offenses is either U.S.S.G. §§ 2N2.1 or 2B1.1. In turn, § 2N2.1 provides that "[i]f the offense involved fraud, apply § 2B1.1." U.S.S.G. § 1B1.2(a) states that a court should "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted)."

As we explained in United States v. Almeida, 710 F.3d 437 (1st Cir. 2013), "where the guidelines specify more than one offense guideline for a particular statutory offense and no plea agreement stipulates to a more serious offense, the district court must select the most appropriate guideline based only on conduct charged in the indictment," id. at 438. We reject Baldwin's assertion that the court should have ignored the indictment and

instead focused on his version of "the facts of the case" in selecting the applicable guideline. The third superseding indictment charged that Baldwin, "<u>with intent to defraud and mislead</u>, misbranded drugs while held for sale after shipment in interstate commerce, and caused the misbranding of drugs while held for sale after shipment in interstate commerce" (emphasis added). The district court did not err in applying U.S.S.G. § 2B1.1 based on the conduct charged in the indictment.

B.        <u>Calculating Loss for Purposes of the Fraud Guideline</u>

Baldwin next argues that the district court erred in (1) finding that his offenses had caused a "loss" within the meaning of U.S.S.G. § 2B1.1(b)(1), and (2) calculating the amount of this loss based on Meetinghouse's gross receipts from the Internet pharmacy operations. We review the court's findings of fact at sentencing, including its calculation of the amount of loss, for clear error, <u>Innarelli</u>, 524 F.3d at 290, but review the court's definition of "loss" and its determination of the appropriate method for calculating loss de novo, <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 82 (1st Cir. 2005).

1.        <u>Determining That Victims Suffered a Loss</u>

U.S.S.G. § 2B1.1(b)(1) provides that a defendant's offense level should be increased based on the amount of loss. Baldwin argues that the government failed to show that his victims -- the customers to whom Meetinghouse dispensed drugs pursuant to

Internet orders -- suffered any loss, since the drugs dispensed were not counterfeit and his customers did not expect the drugs to be dispensed pursuant to a valid prescription.

We reject this argument, as have other courts. The victims did suffer a loss. Meetinghouse dispensed drugs to Internet customers in vials with labels bearing the name of a licensed pharmacy -- i.e., Meetinghouse -- and the name of the purported prescribing physician, along with inserts concerning the medication. From the face of it, the consumers had received entirely legally prescribed drugs. But in fact, they had not. See United States v. Bhutani, 266 F.3d 661, 670 (7th Cir. 2001) ("[T]here was indeed loss to consumers because consumers bought drugs under the false belief that they were in full compliance with the law."); see also United States v. Chatterji, 46 F.3d 1336, 1342 (4th Cir. 1995) (explaining that "[w]e have little doubt that economic loss would exist" where "a drug . . . is something less than it is represented to be").

In addition, from the record and the PSR, it is clear that many of these transactions would never have taken place in the absence of the fraud because the patients could not and would not have received a prescription had they seen a legitimate physician. The government sent out potential victim letters to 21,122 separate Meetinghouse customers. Responding victims or family members reported that many victims had histories of drug addiction which

had been made worse by the ease with which they could order drugs from Internet pharmacies. The PSR took the position that Internet "pharmacies lack quality assurance and accountability and their products pose a serious danger to the buyers/customers, who are often addicted to the medications they seek and for which they could not obtain a valid prescription." The government took the same position in its sentencing memorandum.

2.    Determining the Loss Amount

The PSR took the position that the loss could be reasonably determined and that it was the $3.2 million paid to the Ihenachos by Internet pharmacies, without a discount for the sums defendants paid to drug wholesalers to procure the drugs. It also noted that if "gain" to the defendant were used, the sum would be less (and the guidelines range less).

Application Note 3(B) to U.S.S.G. § 2B1.1 states that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined" (emphasis added). There was no

-23-

discussion of use of loss versus gain at the sentencing hearing.[7]

The court held that:

> I do agree with Probation that the gross figure is the appropriate figure, rather than one adjusted to reflect, as we would if this were a tax issue, the cost of doing business. And I say that in the sense that all of the sales were fraudulent, at least insofar as the drugs that were distributed that were represented to be lawfully branded and lawfully distributed, when the defendant knew well that they were not, knew that that was not the case.

We read this as an acceptance of the PSR's <u>loss</u> determination, based on <u>all</u> sales being fraudulent.

Baldwin argues that "it is possible the district court used a calculation of Ihenacho's purported 'gain' as a surrogate for 'loss,'" and that "the district court erred by treating Ihenacho's gross receipts rather than his net profits as the measure of 'gain.'"[8] The difference in figures affects which

_____

[7] After sentencing, defense counsel stated:

> If you apply the fraud guideline, by virtue of the cross-reference in 2N2.1, and you go back to 2B1.1, you have applied an 18-point enhancement by virtue of a gain in excess of $3 million. Passing for the moment even on whether or not -- whether that's appropriate, which I think that's an inappropriate measure of gain as a matter of law, you don't get to gain -- you can't use gain under 2B1.1 --

The court, in response, stated that it had made its decision.

[8] The cost of ordering drugs from wholesalers is the only cost Baldwin seeks to have deducted from the gross receipts. He asserts that using this method, his profits were between $557,951.80 and $948,360. The government asserted before the district court that the proper amount of Baldwin's profits was actually $1.2 million.

guidelines range is applicable.[9]  As said, the court did not purport to use gain.  The fact that the court used gross receipts does not itself mean the court used gain.

The government defends on two grounds.  The first is that there was no clear error in the district court's use of a loss figure of the $3.2 million the Ihenachos received, by way of the Internet pharmacies, from the customers whose prescriptions their pharmacy had filled.  See Innarelli, 524 F.3d at 290.  The court need only make a reasonable estimate of the loss.  U.S.S.G. § 2B1.1 cmt. n.3(C).

The second argument is that even if the court used "gain" to the defendant as the measure, the $3.2 million may be thought to be the appropriate gain.  That line of argument is, of course, undercut by the statement in the PSR that if gain were used it would be less than the loss.  We have no need to reach the argument.

The Guidelines say, at Application Note 3(A)(i) to U.S.S.G. § 2B1.1, that "loss is the greater of actual loss or intended loss," and that "'[a]ctual loss' means the reasonably

_____

[9] If we accept that profits and not gross receipts are the proper measure of loss in this case and use Baldwin's calculations, a 14-level enhancement should have applied under U.S.S.G. § 2B1.1(b)(1), leaving Baldwin with a sentencing range of 41 to 51 months.  Using profits and the government's calculation, a 16-level enhancement would have applied under § 2B1.1(b)(1) and Baldwin's sentencing range would have been 51 to 63 months.

foreseeable pecuniary harm that resulted from the offense."[10]  We have endorsed a pragmatic, fact-specific approach, stating that "loss should be calculated using the entire price paid for the product, unreduced by any offsetting value," if "the product misrepresented by the defendant is worthless."  United States v. Gonzalez-Alvarez, 277 F.3d 73, 77 (1st Cir. 2002) (applying U.S.S.G. § 2F1.1, the former fraud guideline).

Following on this theme of worthlessness, the government cites to cases which involve goods or services that were determined to have no value.  See United States v. Byors, 586 F.3d 222, 226 (2d Cir. 2009) (in investment fraud case, deducting defendant's costs inappropriate where his "expenditures, legitimate or not, conferred nothing of value and no benefit on his victims, who were

---

[10] Application Note 3(F) to U.S.S.G. § 2B1.1 provides, in relevant part, as follows:

> (v) Certain Other Unlawful Misrepresentation Schemes.
> -- In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

The government refers to this but does not argue to us, and did not argue before the district court, that Baldwin's offenses involved any of these schemes.  We do not reach the issue of whether this application note applies to these facts.

his investors and creditors"); <u>United States</u> v. <u>Milstein</u>, 401 F.3d 53, 74 (2d Cir. 2005) (per curiam) ("The district court may permissibly reason that contaminated medicine is worthless to the consumer."); <u>United States</u> v. <u>Schaefer</u>, 291 F.3d 932, 944 (7th Cir. 2002) (defendant entitled to no credit for value of misrepresented artwork where "the frame and matting surrounding counterfeit or misrepresented cheap cels have no market value other than scrap value"); <u>Gonzalez-Alvarez</u>, 277 F.3d at 78 (where milk had been adulterated by adding contaminated ground water and salt, "the value of the milk . . . was zero as a matter of law"); <u>United States</u> v. <u>Marcus</u>, 82 F.3d 606, 610 (4th Cir. 1996) (drug worthless where its formula had been altered, potentially "affect[ing] the bioequivalence or therapeutic value of the drug," "[g]iven the unchallenged finding that consumers would not purchase a drug of unknown safety and efficacy at any price").

The issue is complex because the victims of the scheme got exactly what they wanted -- prescription drugs for which they had not received proper prescriptions.  They were complicit in the fraud and, in that sense, the drugs were not worthless to them.  Nonetheless, we find the loss calculation to be reasonable for two interrelated reasons.

To the extent that the drugs had value at all in this context, it was quite limited.  There is the dangerous and harmful nature of medications dispensed without valid prescriptions.  There

-27-

is no reason to think these vials of drugs with labels had an after-sale retail value.

Moreover, it is reasonable to think that, but for the existence of these Internet pharmacies allowing customers to obtain drugs without valid prescriptions, these payments (or most of them) would not have been made at all. Many of Meetinghouse's customers online could not have gotten prescriptions for these drugs otherwise. Many had histories of drug addiction. Their abuse was made easier and more serious due to the easy availability of prescription drugs that could be purchased via the Internet without a valid prescription from a physician. At least some of Meetinghouse's Internet customers had been unable to obtain valid prescriptions from their physicians for the drugs they ordered. In general, many customers of Internet pharmacies would be unable to obtain valid prescriptions for the drugs they order. That being so, it was reasonable for the district court to use the $3.2 million figure as a loss amount to determine the guidelines range. See United States v. Munoz, 430 F.3d 1357, 1371 (11th Cir. 2005) (court need not reduce loss amount by proportion of satisfied customers where "the number of individual victims who were satisfied was arguably difficult to determine").

IV.

Gladys challenges the sufficiency of the evidence supporting her convictions for distributing controlled substances,

conspiracy, and money laundering.  We review a preserved challenge to the sufficiency of evidence de novo, considering "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt."  United States v. Willson, 708 F.3d 47, 52 (1st Cir. 2013) (quoting Poulin, 631 F.3d at 22) (internal quotation marks omitted).

A.      The Sufficiency of the Evidence Supporting the Convictions for the Substantive Distribution Offenses

The jury convicted Gladys of five counts relating to the distribution of controlled substances to Golden Island customers on five occasions in September 2008.  Gladys argues that the evidence was insufficient to show that she knew that Golden Island was issuing invalid prescriptions for Meetinghouse to dispense, and that she dispensed these prescriptions herself.  To the contrary, a reasonable jury could easily conclude the evidence was sufficient on both points.

1.      Gladys's Knowledge that the Golden Island Prescriptions Were Invalid

The relevant statute, 21 U.S.C. § 841(a)(1), makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." There was evidence sufficient to conclude that Gladys knew, at

least by August 2008, that Golden Island's prescriptions filled by Meetinghouse were not issued in the usual course of professional practice.

Gladys played an important role in managing Meetinghouse's operations. She was Meetinghouse's majority owner, presented herself as an officer of the corporation, and Baldwin referred to her as his "partner in this business." When Baldwin was away, Gladys was in charge of Meetinghouse.

Gladys was aware that Meetinghouse was dispensing prescriptions for Internet pharmacies, and participated in this activity. A Meetinghouse employee specifically testified at trial that Gladys "ma[d]e sure that we did the Internet prescriptions" when Baldwin was away, issued "instructions about whether to ship the Internet pharmacy packages as well as when not to ship them," and counted pills "[f]or the Internet" business. Gladys received the warning letter from the Missouri Board of Pharmacy stating that Meetinghouse was "engaged in a continuing course of conduct whereby prescription drug orders . . . are dispensed based solely on an on-line questionnaire," and in her handwritten notes regarding this warning she specifically referred to the "medicine for online" and "on line meds."

At least by the time Gladys received this warning in August 2008, if not earlier, she knew that these Internet prescriptions were invalid. The warning stated that "prescriptions

obtained in this manner are not created pursuant to a valid prescriber/patient relationship," so that "such prescriptions are invalid." Gladys argues that this warning put her on notice only that Meetinghouse could not dispense Internet prescriptions to Missouri for the particular website identified in the warning, www.pillsless.net. But in her notes, Gladys wrote that she needed to "[h]ave all displayed medicines for online & put them away," and to "[p]ut away all the on line meds out of site [sic]." A reasonable jury could have concluded from these notes that Gladys knew in August 2008 that all Internet prescriptions Meetinghouse was filling were invalid and hence she had an interest in hiding the evidence.

There was also ample evidence that Gladys was integrally involved in and knew of the arrangements with Golden Island. In an email, Baldwin stated that he "put up a good argument and eventually convinced my wife" to work with Golden Island, and later told Reyes that in his absence Gladys would "run the financial aspects of my business as well as helping out with making sure that your orders are filled and shipped." Beyond that, Gladys sent emails to Reyes demanding that Golden Island wire payments to Meetinghouse for shipments and threatening to delay shipments until payment was received. Gladys knew that Meetinghouse was filling Internet prescriptions for other online pharmacies, Meetinghouse shipped hundreds of packages of prescription drugs on behalf of

Golden Island, and Gladys came to Meetinghouse "[a]lmost everyday" after its Internet business began.

2.      Gladys's Commission of the Substantive Offense of Distributing Controlled Substances

Gladys also argues that even if she knew that Golden Island prescriptions were invalid, the government failed to prove that she actually participated in transferring a controlled substance to another person pursuant to these prescriptions. "'[D]istribute' is defined broadly under § 841(a)(1)," United States v. Cortés-Cabán, 691 F.3d 1, 17 (1st Cir. 2012), to include "not only the transfer of physical possession, but also other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price," id. at 19 (quoting United States v. Luster, 896 F.2d 1122, 1127 (8th Cir. 1990)) (internal quotation mark omitted).

After Gladys was put on explicit notice from the Missouri letter that Internet prescriptions were invalid and that Golden Island was issuing such prescriptions, her primary concern was getting paid. She sent four emails to Reyes demanding that Golden Island wire payments to Meetinghouse. Moreover, Meetinghouse sent prescription medications to five Golden Island customers in September 2008, and Golden Island wired $10,000 directly into Gladys's personal account on September 19, 2008. This evidence, together with the other evidence that Gladys managed shipment of

Golden Island orders, supported the conclusion that Gladys distributed controlled substances under § 841(a)(1).

B.    The Sufficiency of the Evidence Supporting the Conviction for Conspiracy to Distribute Controlled Substances

The jury convicted Gladys as well of conspiracy with Reyes and Baldwin to fill invalid prescriptions for Golden Island between October 2007 and October 2008.  Gladys contends that the government failed to prove either the existence of the Golden Island conspiracy, or that she ever joined this conspiracy.  "[T]o sustain a conviction for conspiracy under 21 U.S.C. § 846, the evidence must show that (1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy."  United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011).  The government presented evidence that Baldwin, Gladys, and Reyes agreed that Meetinghouse would fill prescriptions for Golden Island, and that Gladys participated in this conspiracy despite knowing that Golden Island was issuing Internet prescriptions and that such prescriptions were invalid.

C.    The Sufficiency of the Evidence Supporting the Convictions for the Money Laundering Offenses

The jury also convicted Gladys of conspiring with Baldwin and Reyes to commit international money laundering between March and October 2008, and of committing international money laundering on September 19, 2008, by receiving a wire transfer of $10,000 from

the Dominican Republic.  Gladys argues that (1) because she did not know the Golden Island prescriptions were invalid, she lacked the mens rea needed to support these convictions, and (2) there was no evidence that she was personally involved in the transfer that formed the basis for the substantive conviction.

We have rejected the first argument.  The government presented evidence that (1) in late August  2008, Gladys demanded that Reyes "send substantial money or I will stop [Baldwin] from shippinh [sic]," and (2) on September 19, 2009, $10,000 was wired from the Dominican Republic to Gladys's personal account.  We reject the latter argument, as well.

V.

We <u>affirm</u> the sentence of Baldwin Ihenacho and the convictions of Gladys Ihenacho.